FILED
United States Court of Appeals
Tenth Circuit

**January 26, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

PROCTOR ANDREW YOUNG,

        Plaintiff - Appellant,

v.

CITY OF IDABEL; MAYOR TINA
FOSHEE-THOMAS, in her official
and individual capacities,

        Defendants - Appellees.

No. 16-7018
(E.D. Okla.)
(D.C. No. 6:14-CV-00465-RAW)

---

**ORDER AND JUDGMENT**[*]

---

Before **HOLMES**, **MATHESON**, and **McHUGH** Circuit Judges.

---

Proctor Andrew Young was the fire chief of Idabel, Oklahoma for five

years. In 2013, he was fired for allegedly breaking municipal personnel policies.

Mr. Young sued the City of Idabel and Mayor Tina Foshee-Thomas, arguing that

they ignored a hostile work environment and fired him because of his race. He

also claimed that Ms. Foshee-Thomas withheld exculpatory information during a

related criminal investigation.

---

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

The district court granted summary judgment to the defendants.  We **affirm.**

## I

## A

Mr. Young joined the Idabel Fire Department ("IFD") as a volunteer firefighter in 1995.  In 2008, he was appointed fire chief, a position that he held until he was fired in February 2013.  Mr. Young is African American.  Most of the IFD firefighters are white.

A few years after he became the fire chief, Mr. Young began to notice that some of the white firefighters were rude, poorly behaved, and openly insubordinate whenever he spoke with them.  Though none of the white firefighters mentioned his race at work—as Mr. Young put it, "they knew how to push it *without* saying the 'N word'"—Mr. Young heard rumors that they were openly referring to him by racial slurs outside of the firehouse.  Aplt.'s App., Vol. IV, at 327 (Pl.'s Ex. 1, Dep. of Proctor Andrew Young, dated Jan. 7, 2016) (emphasis added).  One employee told him that the white firefighters were "not doing what [he was] asking them to do" because "they're not going to do what an 'N' is telling them to do."  *Id.* at 326–27.  And he also heard—secondhand—that a firefighter named Kurt Stevenson referred to him as a "nigger" during a 2012 conversation with Kevin Sain, another firefighter, at Mr. Sain's home.  *See id.*, Vol. V, at 454–59 (Pl.'s Ex. 13, Dep. of Kevin Sain, dated Jan. 20, 2016).

2

Mr. Young first raised his concerns with Ms. Foshee-Thomas in 2011. She allegedly was initially dismissive, simply telling Mr. Young that he should discipline the other firefighters and "write them up" if they were "not doing what their daily chores are supposed to be." *Id.* at 366 (Pl.'s Ex. 4, Dep. of Tina Foshee-Thomas, dated Jan. 6, 2016).

Ms. Foshee-Thomas never followed up with Mr. Young after their 2011 conversation. From Mr. Young's perspective, this showed that she was uninterested in his complaints or, worse, irritated that he had sought to discuss them with her. Mr. Young felt that Ms. Foshee-Thomas did "not [have] time for [him]," *id.*, Vol. I, at 106–07 (Ex. B, Dep. of Proctor Andrew Young, dated Jan. 7, 2016), and grew concerned when he "started being eliminated from [contract-negotiation] meetings" after he first raised the issue, *id.* at 89.

**B**

Before Mr. Young got the job, the IFD fire chief had worked conventional business hours, reporting to the station at 8 a.m. and leaving at 4 p.m. However, Mr. Young chose to keep a different schedule when he became chief. Instead of working for eight hours each day, five days a week, he worked shifts of twenty-four hours on duty, followed by forty-eight hours off. He testified that the mayor at the time, Jerry Shinn, approved of his work schedule, but that arrangement was never reduced to writing.

3

Throughout his time with the IFD, Mr. Young also worked part-time as a referee in local football games.  He testified that, on the days that he worked as a referee, he often left work early or came in late for his shift.  He further testified that Idabel's two previous mayors—Mr. Shinn and James Mills—had allowed him to alter his schedule on game days.  Again, Mr. Young never put this agreement into writing.

Municipal employees have to comply with certain requirements whenever they want to change their schedules.  A form signed by Mr. Young, acknowledging receipt of the City's Handbook of Personnel Policies ("Handbook"), states that "no individual is authorized to alter or modify the terms and conditions of employment without authorization of the [Idabel] City Council."  *Id.* at 83 (Ex. A, Employee Acknowledgment Form, dated Dec. 17, 2007).  The Handbook also includes a specific provision concerning secondary employment; it states that "[s]econdary employment is permissible provided it does not interfere, in any manner, with an employee's ability to perform assigned duties as a City employee."  *Id.*, Vol. II, at 134 (Ex. C, City of Idabel Employee Handbook of Personnel Policies, dated Nov. 2007).  The provision also requires employees to "obtain the prior approval of the Department Head for secondary employment."  *Id.*  The City gives all of its employees a copy of the Handbook.  Mr. Young received one in 2007, the year before he became chief.  In December

of that year, he signed an acknowledgment form stating that he had read the Handbook and understood its terms.

Mr. Young never got Ms. Foshee-Thomas's approval to alter his work schedule after she became mayor.  He later explained that he had assumed that she knew about the arrangement when she was elected, pointing out that she was the city clerk when Mr. Shinn and Mr. Mills were mayors.  But Mr. Young conceded that, after Ms. Foshee-Thomas became mayor, she never gave him any indication that she had known about his altered work schedule before assuming the mayoral position.

**C**

In 2012, a volunteer firefighter approached Ms. Foshee-Thomas and told her that a few firefighters had funneled municipal funds into an unauthorized bank account.  Ms. Foshee-Thomas hired Margaret McMorrow-Love, an attorney, to conduct an internal investigation into the IFD's finances.  As part of that investigation, Ms. McMorrow-Love interviewed nearly every full-time IFD employee.  She also reviewed hundreds of internal documents, including payroll records, time sheets, and IFD shift logs.

Ms. McMorrow-Love eventually found that Mr. Young had misdirected City funds into the unauthorized account; she also discovered that Mr. Young had sole control over that bank account.  Mr. Young admitted that he had transferred City funds into the bank account and did not recall getting the City Council's

permission for this action.  After reading Ms. McMorrow-Love's findings, Ms.
Foshee-Thomas concluded that Mr. Young's conduct was "not authorized by law
or by City policy" and was "totally unacceptable . . . [for] a Department Head."
*Id.*, Vol. III, at 173 (Ex. J, Letter from Tina Foshee-Thomas, dated Nov. 26,
2012).  She felt that, based on that offense alone, he should face "substantive
disciplinary action."  *Id.*

But there was more.  During her investigation, Ms. McMorrow-Love also
noticed numerous discrepancies in Mr. Young's time sheets.  Those time sheets
showed that Mr. Young "routinely recorded [having worked] 234 hours" in a
month, even though he was approved to work only 212 hours each month.  *Id.* at
170.  On one sheet, Mr. Young had asked for compensation for an additional
twelve hours without providing explanatory documentation to support the request
(e.g., regarding the date the additional hours were worked).  When confronted
with the time sheets, Mr. Young "freely admitted" to Ms. McMorrow-Love and
Ms. Foshee-Thomas that, "for many years," he had added undocumented work
hours to his time sheets.  *Id.*  He explained that he had recorded the extra time in
order to become eligible for a raise, and said that Mr. Shinn and Mr. Mills had
both approved of the time-sheet adjustments.  He explained that, based on those
prior agreements, he had thought that he did not need the City Council to approve
his time records, so he had never asked for its approval.

On November 26, 2012, Ms. Foshee-Thomas formally notified Mr. Young that he could face discipline for working a second job without permission, misdirecting City funds, and falsifying his time sheets.  The notice also mentioned other conduct that Ms. Foshee-Thomas found "[u]nbecoming [of] a Department Head," such as painting the firehouse's sleeping quarters pink, confiscating the remote control to the firehouse television, and taking a thermal-imaging camera, fire extinguishers, and a fish fryer from the firehouse.  *Id.* at 173–75.  The notice explained that, because the misconduct had violated several City personnel policies, Mr. Young would be suspended without pay.  After giving Mr. Young his notice, Ms. Foshee-Thomas held a disciplinary hearing on December 10, 2012.  Mr. Young attended the hearing, but provided no new information about his alleged misconduct.

After the hearing, Ms. Foshee-Thomas recommended that Mr. Young be fired.  Mr. Young appealed her decision to the City Council; however, it upheld the decision.  Mr. Young's firing was effective on February 9, 2013.

## D

Shortly after Mr. Young was fired, he was criminally charged with two counts of making a false, fictitious, or fraudulent claim against the state, based on Mr. Young's incorrect timesheet entries that he submitted while working for IFD.  A state court held a preliminary hearing, where witnesses testified that Mr. Young

was free to set his own shifts and that, as fire chief, he was excluded from the IFD's union-negotiated shift requirements with the City.

The court eventually quashed the charges against Mr. Young. Its order stated that "[t]he evidence presented by the State failed to prove that the Defendant failed to work the hours that he turned in claims for." *Id.*, Vol. V, at 398 (Pl.'s Ex. 6, Order, dated July 31, 2015). It also laid out seven factual findings, including a determination that Mr. Young "had authority to modify his own [work] schedule," and had "permission . . . to work as [a] referee." *Id.* at 397–98.

## E

Mr. Young then filed a five-count complaint in federal district court. Against both defendants, he brought claims for (1) racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981, (2) hostile work environment in violation of Title VII, (3) racial discrimination in violation of the Equal Protection Clause under 42 U.S.C. § 1983, and (4) malicious prosecution. Against Ms. Foshee-Thomas alone, he brought a claim for intentional infliction of emotional distress ("IIED") under Oklahoma law.

The City and Ms. Foshee-Thomas each moved for summary judgment on all of Mr. Young's claims. The district court granted the defendants' summary-judgment motions. Mr. Young has appealed that ruling.

8

## II

We review the district court's summary-judgment order de novo.

*Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007).

Summary judgment is appropriate when there is "no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." FED. R.

CIV. P. 56(a).

In making this determination, we draw all reasonable inferences in favor of

the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986).[1]  But the nonmoving party may not rely on conclusory

assertions to support its position; instead, the record must show "evidence on

which [a] jury could reasonably find for the [nonmoving party]." *Berry v. T-*

*Mobile USA, Inc.*, 490 F.3d 1211, 1216 (10th Cir. 2007) (quoting *Panis v. Mission*

*Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995)).  "We have long said that

we may affirm on any basis supported by the record, even if it requires ruling on

arguments not reached by the district court or even presented to us on appeal."

*Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011).

---

[1]     Because we review summary-judgment decisions de novo, we need
not separately address arguments—like those Mr. Young advances—that the
district court erred by viewing the evidence in the light most favorable to the
defendants. *Rivera v. City & Cty. of Denver*, 365 F.3d 912, 920 (10th Cir. 2004).

A

Mr. Young argues that the district court erred in granting defendants'

summary-judgment motions on his Title VII discrimination claim.[2]  We disagree.

Title VII makes it unlawful "to discharge any individual, or otherwise to

discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's race."  42

U.S.C. § 2000e-2(a)(1).  A plaintiff can show a Title VII violation through either

direct or indirect evidence.  *Khalik v. United Air Lines*, 671 F.3d 1188, 1192

(10th Cir. 2012).  Unlike direct evidence, indirect evidence requires some kind of

logical inference.  *Cf. Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1249 (10th

Cir. 2002) ("Direct evidence demonstrates on its face that the employment

decision was reached for discriminatory reasons.").  Mr. Young's discrimination

claim relies only on indirect evidence, so we use the burden-shifting analysis set

---

[2]     Though Mr. Young sought relief before the district court for
defendants' alleged racial discrimination under 42 U.S.C. § 1981, in addition to
Title VII, he frames his issues on appeal solely in terms of the latter.  We need
not pause to consider whether this amounts to an instance of waiver, because the
substantive standards under Title VII are the same as those applicable under
§ 1981.  *See Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir.
2011) ("A plaintiff may prove violation of Title VII or 42 U.S.C. § 1981—the
standards are the same—either by direct evidence of discrimination, or by
adhering to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973)." (citations omitted)); *accord Aramburu v. Boeing Co.*, 112
F.3d 1398, 1403 n.3 (10th Cir. 1997).  Therefore, our ultimate conclusion, *infra*,
that Mr. Young cannot prevail on his discrimination claim under Title VII would
apply equally to any § 1981 claim.

out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).  Under

this framework, a plaintiff must first make out a prima facie case for the

violation; next, the burden shifts to the defendant to articulate a

nondiscriminatory reason for the adverse action.  *See id.* at 802–04.  The burden

then shifts back to the plaintiff to prove that the defendant's explanations are a

pretext for an unlawful discriminatory motive.  *Id.*

The parties agree that Mr. Young has established a prima facie case for his

discrimination claim.  The only remaining questions are (1) whether the

defendants offered legitimate reasons for Mr. Young's firing and, if so, (2)

whether Mr. Young showed that those reasons were pretextual.

The answer to the first question is straightforward because the defendants

pointed to plenty of nondiscriminatory reasons for firing Mr. Young.  He worked

a second job without approval, altered his work schedule without approval,

routinely misrepresented his work hours, and improperly transferred City funds

into a bank account under his control.  On top of this, Mr. Young took home IFD

firehouse equipment for his personal use, restricted employees' access to the IFD

television, and painted the firehouse's sleeping quarters pink—using City funds

without permission—simply because he preferred that color.  Any of these acts

would have arguably violated the Handbook and been grounds for termination.[3]

---

[3]      Mr. Young admitted committing the lion's share (if not all of) the

(continued...)

*See* Aplt.'s App., Vol. III, at 175–76 (noting that the Handbook forbids

"[i]nsubordination," "[m]isuse and/or misappropriation of City property,"

"[o]ffensive conduct on duty," and "[f]alsification of city records," and

authorizing termination for such offenses).

Mr. Young maintains, however, that the defendants' proffered non-

discriminatory reasons were a mere pretext for racial discrimination.  He focuses

on one violation in particular—his failure to obtain approval for his second job—

and argues that white city employees were not fired for working two jobs without

permission.  For support, he points to a white employee named Steven Surratt,

who was mentioned in Ms. Foshee-Thomas's deposition testimony.[4]  Mr. Surratt

was "the Department Head for the City's water department" and "was earning

money from the City as a volunteer firefighter at the same time."  Aplt.'s Opening

---

[3](...continued)
violations.  Aplt.'s App., Vol. I, at 102 (testifying that he never sought Ms.
Foshee-Thomas's approval for his second job); *id.* at 98–99 (testifying that he
altered his work schedule without Council approval); *id.*, Vol. IV, at 318–19
(testifying that he transferred City funds into his account without permission).

[4]     In his "Summary of Argument" portion of his opening brief, Mr.
Young summarily refers to "Rusty Sullivan," whom he describes as "[a]nother
city employee . . . caught not working while he was supposed to be on the clock
numerous times and was not disciplined."  Aplt.'s Opening Br. at 10.  He offers
no further information about Mr. Sullivan, including his race, and never mentions
him again in his opening brief.  Consequently, we deem any argument related to
the comparative treatment of Mr. Sullivan to be waived.  *See, e.g.*, *Water Pik, Inc.
v. Med-Sys., Inc.*, 726 F.3d 1136, 1160 (10th Cir. 2013).

12

Br. at 17.  Instead of firing Mr. Surratt, Mr. Young argues, the City "simply told
[him] to stop" working as a volunteer firefighter.  *Id.*

Mr. Young contends that Mr. Surratt's situation is evidence of disparate
treatment based on race, and therefore shows pretext.  *Id.* at 16–17 (citing
*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000)).
Not so.  Mr. Young could have shown pretext with "evidence that . . . he was
treated differently from other similarly-situated employees who violated work
rules of comparable seriousness."  *Salguero v. City of Clovis*, 366 F.3d 1168,
1176 (10th Cir. 2004) (omission in original) (quoting *Kendrick*, 220 F.3d at
1230).  But that would  require him to show that Mr. Surratt was "similarly
situated in relevant respects," *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S.
356, 366 n.4 (2001)—namely, that he and Mr. Surratt were "subject to the same
standards governing performance evaluation and discipline," *Aramburu v. Boeing
Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) (quoting *Wilson v. Utica Park Clinic,
Inc.*, No. 95-5060, 76 F.3d 394, 1996 WL 50462, at *1 (10th Cir. 1996)
(unpublished)), and were "disciplined for conduct of 'comparable seriousness.'"
*McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006) (quoting
*Kendrick*, 220 F.3d at 1230).

Mr. Young has not made this showing.[5]  For one thing, Mr. Young had been

---

[5]     In his brief, Mr. Young seems to argue that the defendants had the
(continued...)

13

working part-time as a referee for at least four years when Ms. Foshee-Thomas became mayor, but the record never indicates how long Mr. Surratt had been working his second job when the City discovered it.  This makes it difficult to determine whether Mr. Surratt's violation was of "comparable seriousness" to Mr. Young's.  *See Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1121–22 (10th Cir. 2007); *McGowan*, 472 F.3d at 745–46.  Mr. Young also fails to show that he and Mr. Surratt were "subject to the same standards" for discipline, *Aramburu*, 112 F.3d at 1404 (quoting *Wilson*, 1996 WL 50462, at *1), other than by conclusorily pointing out that, as department heads, "their employment was controlled by the City Council," Aplt.'s Opening Br. at 18.

Moreover, the record shows that Mr. Surratt's misconduct occurred years before Mr. Young's.  And, as we have pointed out in the past, an employer's "disciplinary practices [may] change over time," so "it would be inappropriate for courts to penalize [an] employer[]" who takes a different approach to similar disciplinary violations occurring years apart.  *Kendrick*, 220 F.3d at 1234; *see*

---

[5](...continued)

burden of disproving his allegations of disparate treatment with respect to Mr. Surratt.  Aplt.'s Opening Br. at 17–18 ("There was no evidence presented by Defendants that the Plaintiff and Mr. Surratt were *not* similarly situated in any other regard." (emphasis added)).  This misstates the law: Under the *McDonnell Douglas* burden-shifting framework, Mr. Young has the burden of proving that Mr. Surratt *was* similarly situated.  *See McDonnell Douglas Corp.*, 411 U.S. at 802–04; *see also Kendrick*, 220 F.3d at 1230, 1232–33 (explaining that a plaintiff has the burden of showing pretext through evidence of disparate treatment relative to similarly situated employees who are not in the protected class).

14

*also Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1082–83 (10th Cir. 1999)
(declining to find pretext when record showed that company decided to "t[ake] a
more serious stance" against misconduct after the comparator's violation, which
had occurred before the plaintiff's own violation).

Mr. Young also argues that the district court should have found pretext
based on Ms. Foshee-Thomas's testimony in the February 2014 preliminary
hearing in state court.  He points out that, in the hearing, Ms. Foshee-Thomas
testified that she had no evidence to show that Mr. Young was required to work a
set shift as fire chief.  Mr. Young then compares Ms. Foshee-Thomas's hearing
testimony with Ms. McMorrow-Love's January 2016 deposition testimony; there,
Ms. McMorrow-Love testified that Ms. Foshee-Thomas never told her that Mr.
Young was *not* required to record his time worked on times sheets.  Mr. Young
contends that the "inconsistenc[ies] between [Ms. Foshee-Thomas's statements
and] the information [she] provided to [Ms. McMorrow-]Love" create an
inference of discriminatory motive in Mr. Young's firing.  Aplt.'s Opening Br. at
20–21.

This argument misses the mark.  It is true, as Mr. Young notes, that pretext
can be "shown by . . . 'inconsistencies . . . in [an] employer's proffered legitimate
reasons.'"  *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quoting
*Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951–52 (3d Cir. 1996)).  But such
"inconsistencies" show pretext only when they render an employer's justifications

15

so "unworthy of credence" that a jury could reasonably "infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (quoting *Olson*, 101 F.3d at 951–52). At the outset, it is not clear to us that Mr. Young has demonstrated any inconsistency in Ms. Forshee-Thomas's testimony. Even assuming that he has, it certainly is not the kind of inconsistency that would give rise to a triable inference of pretext.

Instead, Mr. Young simply points out that Ms. Foshee-Thomas had no evidence to support her belief that he was working a second job when he should have been working as fire chief. If anything, this suggests only that Ms. Foshee-Thomas was mistaken in her belief that he violated City personnel policies. And that mistake does not necessarily show pretext; after all, an employer's mistaken belief can still be a legitimate, nondiscriminatory reason under Title VII. *See, e.g.*, *Piercy v. Maketa*, 480 F.3d 1192, 1200 (10th Cir. 2007) ("Even a mistaken belief can be a legitimate, non-pretextual reason for an employment decision."); *Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1268–69 (10th Cir. 2004) (employer's good faith belief "would not be pretextual even if the belief was later found to be erroneous" (quoting *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998))); *see also Finney v. Lockheed Martin Corp.*, 654 F. App'x 943, 947 (10th Cir. 2016) (unpublished) ("Even a mistaken understanding can be a legitimate, nondiscriminatory reason for discharge, so long as the decision maker honestly believed in his mistaken understanding.").

16

Moreover, Mr. Young fails to show that Ms. Foshee-Thomas *knew* that he had no set work hours when she fired him.  If he had shown this, this could have advanced his cause because this evidence would have supported an inference that Ms. Foshee-Thomas acted in bad faith, which in turn could have supported a finding of pretext.  *Cf. Rivera v. City & Cty. of Denver*, 365 F.3d 912, 924–25 (10th Cir. 2004) (noting that "[t]he relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct," but whether the employer "acted in good faith upon those beliefs" (second alteration in original) (quoting *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002))).  But Mr. Young has not shown that.  At best, he has demonstrated that Ms. Foshee-Thomas made an unwise, ill-informed employment decision—and not, as he argues, a discriminatory one.  *See Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006) ("[O]ur role is to prevent intentional discriminatory [employment] practices, not to . . . second guess[] employers' honestly held (even if erroneous) business judgments.").

Mr. Young has not shown that the defendants' proffered reasons for firing him were pretextual.  Consequently, Mr. Young has not carried his burden under the *McDonnell Douglas* rubric.  We therefore uphold the district court's ruling

17

against him regarding his Title VII claim.[6]

## B

Next, we consider Mr. Young's hostile-work-environment claim under Title VII. To prevail on that claim, he must "show that a rational jury could find that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Herrera v. Lufkin*

---

[6]      In making his argument regarding the purported "inconsistencies" in Ms. Foshee-Thomas's testimony, Mr. Young suggests that the district court should have considered the state court's order dismissing the criminal charges against him. Aplt.'s Opening Br. at 18–19. That order listed seven "factual findings" that the judge reached after hearing testimony from Ms. Foshee-Thomas and other City employees. Aplt.'s App., Vol. V, at 397–98. The judge found that Mr. Young:

> (1) [was] in charge of the [IFD],
> (2) had authority to modify his own schedule,
> (3) [was] excluded from strict 24 hour shifts,
> (4) . . . was not required to record actual times on time sheets,
> (5) [had] permission . . . to work as referee[,]
> (6) [had] time sheets [that] . . . show . . . only total hours worked[,]
> (7) . . . set his own work schedule.

*Id.* But, as the district court noted, the state court made these findings in July 2015, more than two years after Mr. Young was fired. So, even if we were to give the findings consideration and weight in our analysis, they would have limited probative value regarding whether Ms. Foshee-Thomas actually knew the particulars of Mr. Young's work requirements *at the time that she fired him. See, e.g.*, *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1092 (10th Cir. 2007) (concluding, in Title VII context, that the pretext inquiry depends on "whether the employer's stated reasons were held in good faith at the time" that the adverse action was taken (quoting *Young*, 468 F.3d at 1250)).

*Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007) (quoting *Sandoval v. City of Boulder*, 388 F.3d 1312, 1326–27 (10th Cir. 2004)).  He must also show that he was "targeted for harassment because of [his] . . . race."  *Sandoval*, 388 F.3d at 1326–27.

The standard for a hostile-work-environment claim has both objective and subjective components.  *See Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1268 (10th Cir. 2013); *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012); *Morris v. City of Colo. Springs*, 666 F.3d 654, 663–64 (10th Cir. 2012).  This "dual standard" asks "whether [Mr. Young] was offended by the work environment and whether a reasonable person would likewise be offended."  *Morris*, 666 F.3d at 664 (quoting 3 Lex K. Larson, EMPLOYMENT DISCRIMINATION § 46.05(3)(e), at 46–93 (2d ed. 2011)).  Mr. Young must satisfy both prongs to succeed on his claim.  *Id.*

Mr. Young argues that there was an atmosphere of "racial tension in the fire department," Aplt.'s Opening Br. at 23, and points to several events to support this assertion.  First, he claims that Ms. Foshee-Thomas's and Ms. McMorrow-Love's investigation "directly affected [his] employment" and "contributed to a hostile work environment."  *Id.* at 26–27.  Second, he claims that white employees were "constantly . . . insubordinat[e]," and "file[d] petty grievances with the firefighter's union" whenever they "disagreed with something he did."  *Id.* at 23.  And third, he points out that Mr. Stevenson called him a

19

"nigger" during a conversation with another employee. *Id.* at 25–26.

    None of this shows that the firehouse was an objectively hostile work environment. *See Herrera*, 474 F.3d at 680. First, Mr. Young never explains how Ms. Foshee-Thomas's investigation was "motivated by bias against [him] on the grounds of . . . race." *Sandoval*, 388 F.3d at 1327. And the mere fact of an investigation into Mr. Young's behavior, without some evidence that the investigation was racially motivated, is not enough to show a hostile work environment. *See, e.g.*, *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 565 (7th Cir. 2009) (rejecting hostile-work-environment claim and finding that plaintiff had not "adduce[d] evidence that she was targeted for scrutiny on account of her sex"); *O'Brien v. Dep't of Agric.*, 532 F.3d 805, 810 (8th Cir. 2008) (noting that "increased scrutiny might, at some point, amount to a hostile work environment," but rejecting hostile-work-environment claim for lack of evidence of a discriminatory purpose on part of supervisor); *cf. Flood v. Bank of Am. Corp.*, 780 F.3d 1, 12–13 (1st Cir. 2015) (finding that plaintiff showed a hostile work environment by showing connection between increased scrutiny and supervisor's clear discomfort with plaintiff's sexual orientation).

    For similar reasons, Mr. Young's second argument—that white firefighters' insubordination and disrespect created a hostile work environment—does not fare better. Mere insubordination—even an outright refusal to do one's job—does not amount to a Title VII violation. *See, e.g.*, *Somoza v. Univ. of Denver*, 513 F.3d

20

1206, 1217–18 (10th Cir. 2008) (junior colleague's criticism, rudeness, and failure "to interact . . . at meetings" did not amount to severe and pervasive harassment).  And, though Mr. Young suggests that the insubordination was a product of racism among the white firefighters, his evidence is mostly speculative.  For example, another firefighter told Mr. Young that the white firefighters supposedly were "not doing what [he was] asking them to do" because "they're not going to do what an 'N' is telling them to do."  Aplt.'s App., Vol. IV, at 326–27.  But Mr. Young has no first-hand knowledge that this was true; their alleged insubordination could just as well have been motivated by other factors.  Similarly, Mr. Young also testified that he felt "harassed . . . when [firefighters] [we]re not doing what [Mr. Young was] asking," and presumed that this was because of his race.  *Id.*, Vol. I, at 109–10 ("[T]hey knew how to push it without saying the 'N word.'").  Yet, Mr. Young could not recall any instances in which the white firefighters had used racially derogatory language, told racially tinged jokes, or did "anything else that . . . [he] felt was racially discriminatory." *Id.* at 117–18.

Though facially race-neutral workplace misconduct can play a role in engendering a racially hostile work environment, it is not sufficient standing alone; there actually must be race-based discriminatory conduct polluting the environment, and Mr. Young offers us little non-speculative evidence of it, and certainly not enough to establish his Title VII claim of hostile work environment.

21

*See Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1224 n.6 (10th Cir. 2015); *Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005); *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1263 (10th Cir. 2005) ("Indeed, Title VII is not 'a general civility code for the American workplace.'" (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998))).  In fact, he points to only one concrete incident in which another employee displayed overt racial animus—specifically, when Mr. Stevenson called Mr. Young a "nigger" outside of his presence during a 2012 conversation in Mr. Sain's home.  *See* Aplt.'s App., Vol. V, at 454–59.

We do not question that Mr. Stevenson's comment is objectively offensive. *See Lounds*, 812 F.3d at 1229 (discussing "the potentially strong polluting power of this the time-worn word, 'nigger'"); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 422 (4th Cir. 2014) ("'[T]he word "[nigger]" is pure anathema to African-Americans,' as it should be to everyone." (quoting *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001))).  But Mr. Stevenson made the comment during a private conversation in Mr. Sain's home.  *See* Aplt.'s App., Vol. V, at 454–59.  Even assuming *arguendo* that the contents of a conversation that takes place outside of the workplace (or someplace functionally equivalent to the workplace) may be fully considered in the hostile-work-environment analysis,[7] the polluting power of Mr. Stevenson's "nigger" comment was minimal

---

[7]     Mr. Young argues that events outside of the workplace should be
(continued...)

22

at best.  We have repeatedly held that, in establishing a hostile-work-environment

claim, plaintiffs must do more than point to "sporadic racial slurs"; they must

present evidence of "a steady barrage of opprobrious racial comments."  *Bolden v.*

*PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1994); *accord Lounds*, 812 F.3d at 1223

(collecting cases).  It follows *a fortiori* that Mr. Stevenson's singular racial

epithet could have no more than minimal polluting effect, and it certainly falls

"far short" of establishing Mr. Young's hostile-work-environment claim.  *Chavez*,

397 F.3d at 832.

To reprise, aside from Mr. Stevenson's isolated comment, Mr. Young has

pointed to no concrete, non-speculative instances of racially discriminatory

conduct by other IFD employees.  Consequently, he has not demonstrated that the

firehouse was an objectively hostile work environment on the basis of race.  Mr.

---

[7](...continued)
considered in the hostile-work-environment analysis.  In particular, he contends
that Mr. Stevenson's comment "transcended to the workplace" because "[a] jury
could easily infer that the racial epithets used by a Caucasian employee referring
to not wanting to work for the Plaintiff translated to insubordination, petty
grievances and indignation with respect to taking orders from the Plaintiff in the
workplace."  Aplt.'s Opening Br. at 26–27.  Our precedent suggests that we
accord less weight in the hostile-work-environment analysis, in certain
circumstances, to discriminatory comments uttered outside of the workplace (or
someplace functionally equivalent to the workplace).  *See Sprague v. Thorn Ams.,*
*Inc.*, 129 F.3d 1355, 1366 (10th Cir. 1997).  However, in light of our assumption
*supra*, we need not opine on the nature of any limitations that might be properly
placed on the consideration in the hostile-work-environment analysis of
discriminatory conduct that takes place outside of the workplace (or someplace
functionally equivalent to the workplace).

Young's hostile-work-environment claim must fail. *See Chavez*, 397 F.3d at 833.

## C

Mr. Young also appeals from the district court's ruling on his § 1983 claim alleging a violation of the Equal Protection Clause. That claim asserted that Ms. "Foshee-Thomas promulgated, created, implemented and/or possessed responsibility for" the "policies, practices and/or customs" that led to Mr. Young's termination. Aplt.'s App., Vol. I, at 16 (Compl., dated Oct. 22, 2014). Those "policies," he alleged, included her failure to respond to Mr. Young's complaints about racism in the firehouse, her decision to fire Mr. Young over conduct for which white employees had never faced consequences, and her decision to bring criminal charges against Mr. Young.

Originally, Mr. Young brought his § 1983 equal-protection claim against both the City and Ms. Foshee-Thomas in her official and individual capacities. But his brief does not develop an argument with respect to his § 1983 individual-capacity claim against Ms. Foshee-Thomas; instead, he discusses only whether her official duties could establish the City's municipal liability. It is axiomatic that a § 1983 claim against a municipal employee in his or her official capacity is "the equivalent" of a suit against the municipality. *Lopez v. LeMaster*, 172 F.3d 756, 762 (10th Cir. 1999). Consequently, we deem Mr. Young's § 1983 individual-capacity claim against Ms. Foshee-Thomas to be waived. *See, e.g.*, *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) (noting that an

24

appellant's brief must contain the "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies" (quoting FED. R. APP. P. 28(a)(8)(A))); *Wyoming v. Livingston*, 443 F.3d 1211, 1216 (10th Cir. 2006) ("[The appellant] did not address this issue in its opening appellate brief.  The issue is therefore waived.").

Without the individual-capacity claims, Mr. Young's § 1983 appeal raises only one issue: whether he has shown that the City engaged in a policy of discrimination sufficient to establish municipal liability.  To meet this standard, Mr. Young must show that an "employee's discriminatory actions are representative of an official policy or custom of the [City]," or that those actions were "taken by an official with final policy making authority."  *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1249 (10th Cir. 1999); *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988).  Mr. Young argues that Ms. Foshee-Thomas had final policymaking authority, and that her decision to fire him was effectively a decision by the City itself.

Whether an official has final policymaking authority is a question of state and local law.  *See, e.g.*, *Praprotnik*, 485 U.S. at 124.  In deciding whether an official is a final policymaker, "we are interested only in delegations of *legal power*."  *Milligan-Hitt v. Bd. of Trs. of Sheridan Cty. Sch. Dist. No. 2*, 523 F.3d 1219, 1227 (10th Cir. 2008).  That requires us to assess "where *statutory* policymaking authority lies, rather than where *de facto* authority may reside."

25

*Wulf v. City of Wichita*, 883 F.2d 842, 869 (10th Cir. 1989) (first emphasis

added).  We look to three factors in making that determination:  "(1) whether the

official is meaningfully constrained 'by policies not of that official's own

making[';] (2) whether the official's decision[s] are final—i.e., are they subject to

any meaningful review; and (3) whether the policy decision purportedly made by

the official is within the realm of the official's grant of authority."  *Randle v. City

of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995) (quoting *Praprotnik*, 485 U.S. at

127).

We apply that framework here and conclude that Ms. Foshee-Thomas did

not have final policymaking authority.  The City of Idabel has a statutory

aldermanic form of government pursuant to Oklahoma state law.  *See* OKLA.

STAT. TIT. 11, § 9-101, *et seq.*; Aplt.'s App., Vol. III, at 178 (Ex. K, Letter from

Tina Foshee-Thomas, dated Dec. 14, 2012) ("As you and your legal counsel have

been advised, the City of Idabel has adopted a statutory aldermanic form of

government.").  Under that arrangement, a city's "governing body . . . consist[s]

of the mayor, who is elected at large, and one or two councilmembers from each

ward of the city."  OKLA. STAT. TIT. 11, § 9-102.  And though a mayor has the

power to "remove or suspend city officers," OKLA. STAT. TIT. 11, § 9-105(3), that

removal power is not final.  Instead, any "remov[al]" is effective only

"until . . . the [city] council shall take action on the charges."  *Id.*  Thus, any

firing decision made by Ms. Foshee-Thomas needed to be approved by the City

26

Council before it could become final.

Given the statutory constraints on her power, Ms. Foshee-Thomas's

decision to fire Mr. Young cannot "fairly be said to be [the decision] of [Idabel]

itself." *Carney v. City & Cty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008)

(quoting *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1177 (10th Cir.

2003)). Accordingly, she was not the "final policymaker" for the City.[8] *See, e.g.*,

---

[8]    On appeal, Mr. Young appears to present another theory of municipal liability—that the City should be liable because the "City Council is necessarily part of the City as it is tasked with approval of the Mayor's decisions." Aplt.'s Opening Br. at 28. In this regard, Mr. Young claims that the district court erred in focusing only on the official actions of Ms. Foshee-Thomas in resolving this claim, noting that he had "submitted evidence that established racial animus on behalf of *the City Council* by demonstrating the disparate treatment between [Mr. Young] and Steve Surratt . . . . [and] also supplied evidence of past treatment of another African American employee, Billy Mack, wherein he was terminated and criminal charges were brought against him as well." *Id.* at 12–13 (emphasis added). However, in his summary-judgment briefing, Mr. Young seemed to premise his argument for municipal liability regarding this claim on the contention that Ms. Foshee-Thomas, as mayor, had "final policymaking authority" for § 1983 purposes. *See* Aplt.'s App., Vol. IV, at 303–07 (Pl.'s Resp. in Opp'n to Def. City of Idabel's Mot. for Summ. J., dated Jan. 25, 2016) (quoting *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010)). Consequently, a cogent case could be made that this additional theory was forfeited below and that Mr. Young has effectively waived it before us by failing to argue under the plain-error rubric. *See, e.g.*, *Richison*, 634 F.3d at 1128, 1130–31. Even assuming *arguendo* this theory was preserved, it would not alter the result that we reach here. As noted *supra* in Part II.A, Mr. Young has failed to demonstrate that Mr. Surratt was similarly situated to him; therefore, no triable inference of racial discrimination could arise from the allegedly different treatment that he received at the hands of the City (or City Council). With regard to Mr. Mack, it is apparently undisputed that, prior to Mr. Young's dismissal, the City (or City Council) terminated his employment for using prisoners of the State's Department of Corrections to perform "personal yard work" for him. Aplt.'s Opening Br. at

(continued...)

*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1190 (10th Cir.

2010) ("[The school board] was the sole final policymaker on school matters and

all of [an administrator's] decisions were legally constrained by Board policies.

Thus, [the administrator] was not a final policymaker for the Academy.");

*Milligan-Hitt*, 523 F.3d at 1228–29 ("[U]nder the board's policies at issue in this

case, the superintendent's hiring decisions 'are reviewable by others.' . . . This

review prevents the superintendent from being a final policymaker." (quoting *Dill*

*v. City of Edmond*, 155 F.3d 1193, 1211 (10th Cir. 1998))).

## D

Mr. Young also challenges the district court's ruling on his malicious-

---

[8](...continued)

30; *accord* Aplee.'s Br. at 22.  Mr. Young does not argue that such conduct could
not appropriately be the subject of criminal charges; he just alleges that "the only
employees who faced criminal prosecution as a result of employment-related
matters [were] African American."  Aplt.'s Opening Br. at 31.  Mr. Young,
however, does not establish that the articulated reasons of the City (or City
Council) regarding the decision to fire—and allegedly support the prosecution
of—Mr. Mack were pretextual.  In that regard, he offers neither further examples
of racial-minority City employees facing criminal prosecution for work-related
conduct nor, importantly, details regarding non-racial-minority City employees
whose workplace conduct might have—but did not—subject them to criminal
charges, so that such employees might qualify as possible comparators.  Thus, we
would be hard-pressed—based on Mr. Young's limited argument—to discern from
this one other prior instance of an African American City employee facing
criminal charges "a [discriminatory] pattern with respect to . . . treatment of
African American city employees," *id.* at 30, that could be attributed to the City
Council—and, as a consequence, the City.  *See Coffey v. McKinley Cty.*, 504 F.
App'x 715, 719 (10th Cir. 2012) (unpublished) ("One prior incident, even if it
was a constitutional violation sufficiently similar to put officials on notice of a
problem, does not describe a pattern of violations.").

prosecution claim.  In bringing that claim, he alleged that Ms. Foshee-Thomas had withheld potentially exculpatory information when the Oklahoma State Bureau of Investigation ("OSBI") was considering whether to charge him with making false statements.[9]

We have repeatedly recognized a cause of action under § 1983 for malicious prosecution under the Fourth Amendment.  *See Sanchez v. Hartley*, 810 F.3d 750, 755 (10th Cir. 2016), *cert. denied*, 137 S. Ct. 1372 (2017).  To show malicious prosecution, a plaintiff must show that (1) the defendant caused the plaintiff's prosecution; (2) the original action terminated in the plaintiff's favor; (3) no probable cause supported the original prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages.  *See Fletcher v. Burkhalter*, 605 F.3d 1091, 1095 (10th Cir. 2010); *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008).

Mr. Young argues that Ms. Foshee-Thomas deliberately withheld from the

---

[9]   The district court noted that Mr. Young's amended complaint asserted his malicious-prosecution claim against both the City and Ms. Foshee-Thomas, but pointed out that "the parties' briefing seems to assume the claim is only against [Ms. Foshee-Thomas] in her individual capacity."  Aplt.'s App., Vol. VIII, at 662 (Order, dated Feb. 23, 2016).  *See also id.*, Vol. IV, at 280–310 (omitting malicious-prosecution argument from brief in response to City's summary-judgment motion).  The court therefore dismissed that claim against the City.  On appeal, Mr. Young does not mention whether he brings his claim against both defendants or Ms. Foshee-Thomas alone.  Through his actions before the district court and before us, Mr. Young has failed to preserve a malicious-prosecution claim against the City for review.

29

OSBI during its investigation exculpatory information about Mr. Young's work schedule—specifically, that he was not required to work set shifts, that he had the power to set his own working hours, and that he had no obligation to log his time on City time sheets.  Had Ms. Foshee-Thomas disclosed that information, Mr. Young argues, "it certainly would have affected whether the State had probable cause" to prosecute him for making false statements.  Aplt.'s Opening Br. at 33.

Mr. Young's argument here is essentially the same as the one that he presented in attempting to show pretext with respect to his Title VII claim. Specifically, Mr. Young points to Ms. Foshee-Thomas's February 2014 preliminary-hearing testimony.  There, she testified that she had no evidence to show that Mr. Young was required to work a set shift as fire chief.  Mr. Young then compares Ms. Foshee-Thomas's hearing testimony with Ms. McMorrow-Love's January 2016 deposition testimony, during which Ms. McMorrow-Love testified that Ms. Foshee-Thomas never told her that Mr. Young was not required to record his time worked on times sheets.  Mr. Young argues that "[t]he fact that [Ms. Foshee-Thomas] did not relay this information [about circumstances related to Mr. Young's work schedule] to [Ms. McMorrow-Love] . . . demonstrates an issue of fact as to whether [Ms. Foshee-Thomas] withheld exculpatory evidence with respect to [Mr. Young]."  *Id.* at 33.

But Mr. Young fails to show that Ms. Foshee-Thomas acted with the requisite malice.  Specifically, he needed to demonstrate that she either knew that

he could set his own work schedule, or that she recklessly disregarded that

possibility.  *See, e.g., Sanchez*, 810 F.3d at 758 (holding that detectives would

incur liability for malicious prosecution if they "knowingly or recklessly used

false information to institute legal process"); *Pierce v. Gilchrist*, 359 F.3d 1279,

1295 (10th Cir. 2004) ("The consensus of the common law extends liability [for

malicious prosecution] to those who continue prosecutions against criminal

suspects *upon knowledge that there is no probable cause* to proceed against the

accused." (emphasis added)); *Taylor v. Meacham*, 82 F.3d 1556, 1563 (10th Cir.

1996) (rejecting a plaintiff's § 1983 malicious-prosecution claim, which alleged

that a sheriff had made false statements in the arrest warrant, when there was "no

evidence . . . [that the sheriff] knowingly" lied in the affidavit (emphasis

omitted)); *cf. Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996) ("It is a

violation of the Fourth Amendment for an arrest warrant affiant to 'knowingly

. . . , or with reckless disregard for the truth,' include false statements in [an]

affidavit, or to knowingly or recklessly omit from the affidavit information which,

if included, would have vitiated probable cause." (citations omitted) (quoting

*Franks v. Delaware*, 438 U.S. 154, 155–56 (1978))).  But Mr. Young fails to

make this showing.

First, nothing in the record indicates that Ms. Foshee-Thomas ever knew

about Mr. Young's work schedule during the OSBI's investigation.  The

"inconsistencies" that he points to demonstrate only that she had no evidence to

support her belief that Mr. Young was working unauthorized hours or was required to submit accurate time sheets.  Aplt.'s Opening Br. at 13; *see* Aplt.'s App., Vol. V, at 392–94 (Pl.'s Ex. 5, Tr. Prelim. Hr'g, dated Feb. 5, 2014).  In this regard, Ms. Foshee-Thomas testified that her understanding was that only elected officials "[we]ren't required to . . . keep time sheets," which she believed "had always been done [in] the [C]ity of Idabel" but she did not have "any evidence" to validate her understanding.  *Id.* at 391–92.

Second, Mr. Young never explains how Ms. Foshee-Thomas would have had access to any information that would have cast doubt on whether there was probable cause to arrest Mr. Young.  His brief asserts that he "had previously been given permission to referee [football] games in the past," but fails to note that he had gotten permission from the previous mayors, not from Ms. Foshee-Thomas.  Aplt.'s Opening Br. at 35.    The record shows only that Ms. Foshee-Thomas thought—apparently incorrectly—that Mr. Young was required to record his time during the course of the OSBI's investigation.  Mr. Young never shows otherwise, so he fails to satisfy the fourth prong of his malicious-prosecution claim (i.e., as to malice).  We therefore uphold the district court's ruling on this claim.

32

**E**

Finally, we turn to Mr. Young's IIED claim, brought under Oklahoma law.

Oklahoma has adopted the IIED standard set out in the RESTATEMENT (SECOND)

OF TORTS.  *See Miller v. Miller*, 956 P.2d 887, 901 (Okla. 1998) (citing

RESTATEMENT (SECOND) OF TORTS § 46 (1977)).  Under that standard, an IIED

claim requires extreme and outrageous conduct, coupled with severe emotional

distress.  *Id.*  The conduct must be considered "in the setting in which it

occurred."  *Eddy  v. Brown*, 715 P.2d 74, 77 (Okla. 1986).

This is a high bar to clear.  Indeed, we have noted that, for an IIED claim to

succeed, "the distress must be of such a character that 'no reasonable person

could be expected to endure it.'"  *Daemi v. Church's Fried Chicken, Inc.*, 931

F.2d 1379, 1389 (10th Cir. 1991) (quoting RESTATEMENT (SECOND) OF TORTS

§ 46 cmt. j (1965)) (applying Oklahoma law).

Mr. Young argues that Ms. Foshee-Thomas's "terminating [of his]

employment and participat[ion] in his continued prosecution" amounted to IIED.

Aplt.'s Opening Br. at 36.  For support, he argues that Ms. Foshee-Thomas

"cost[] [him] his employment" and "with[held] exculpatory evidence" during the

OSBI's investigation.  *Id.*

But, as the district court noted, this is not enough.  We have repeatedly

rejected arguments that termination itself can amount to IIED.  *See Roberts v.

Int'l Bus. Machs. Corp.*, 733 F.3d 1306, 1311 (10th Cir. 2013) (rejecting

employee's IIED claim that "characterizes his termination as intentional infliction of emotional distress"); *see Montgomery v. City of Ardmore*, 365 F.3d 926, 942 (10th Cir. 2004); *Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1176 (10th Cir. 1996).  Moreover, a superior's rude or hostile treatment of an employee, without more, is not enough to meet the IIED standard.  *See Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1559 (10th Cir. 1995) (an employer's hostile questioning of an employee "in the context of [the] employer's investigation of embezzlement," did not "cross the bounds between what is merely rude and objectionable and what is actionable"); *Daemi*, 931 F.2d at 1388 (rejecting an employee's claim that his superior inflicted severe emotional distress by "impugning [the plaintiff's] integrity," "accusing him of criminal acts, and requiring him to take a polygraph"); *Merrick v. N. Nat. Gas Co.*, 911 F.2d 426, 432–33 (10th Cir. 1990) (holding that a superior's conduct was not "extreme or outrageous" when the superior "harshly criticiz[ed]" the employee, "yell[ed] at him, curs[ed] at him," and humiliated him in front of co-workers).

Furthermore, Mr. Young offered nothing to show that he suffered severe distress.  In *Daemi*, we rejected a plaintiff's IIED claim, even though he presented evidence that his employer's behavior made him "literally sick to his stomach" and caused him to seek treatment from a physician.  931 F.2d at 1388–89.  We came to a similar conclusion in *Zeran v. Diamond Broadcasting, Inc.*, 203 F.3d 714, 721 (10th Cir. 2000), concluding that a plaintiff's IIED claim failed due to

"the lack of evidence showing that the distress interfered with [his] ability to conduct his daily life affairs."  Mr. Young has never even attempted to show how Ms. Foshee-Thomas's actions caused him the level of severe distress that our caselaw has demanded.  Without that showing, his claim fails.

## III.

For the foregoing reasons, we affirm the district court's judgment.

ENTERED FOR THE COURT

Jerome A. Holmes
Circuit Judge